# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 29, 2010 at Knoxville

## STATE OF TENNESSEE v. JONATHAN DORAN TEARS

**Appeal from the Circuit Court for Marshall County**
**No. 08-CR-101     Robert Crigler, Judge**

---

**No. M2009-01559-CCA-R3-CD - Filed October 26, 2010**

---

Following a jury trial, the Defendant, Jonathan Doran Tears, was convicted of attempted second degree murder, a Class B felony (Count 1); two counts of aggravated assault, a Class C felony (Counts 2-3); unlawful possession of a weapon, a Class E felony (Count 4); possession of a firearm during the commission of a felony, a Class D felony (Count 5); and employment of a firearm during the commission of a felony, a Class C felony (Count 6). The trial court merged Counts 2 and 3 with Count 1, and the trial court merged Counts 4 and 5 with Count 6. The trial court then sentenced the Defendant as a Range II, multiple offender and ordered the Defendant to serve 15 years for the attempted second degree murder conviction and a consecutive 10 years for the employment of a firearm during the commission of a felony conviction, for a total effective sentence of 25 years. The trial court also ordered these sentences to be served consecutively to a sentence imposed in a separate case. In this appeal as of right, the Defendant contends that (1) the evidence was insufficient to support his convictions of attempted second degree murder and possession and employment of a firearm during the commission of a felony and that (2) the trial court erred in sentencing him. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Donna Orr Hargrove, District Public Defender; and Michael J. Collins and William Harold, Assistant Public Defenders, attorneys for appellant, Jonathan Doran Tears.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Charles Frank Crawford, District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, attorneys for appellee, State of Tennessee.

# OPINION

Gary DeJuan O'Neal, the victim, testified that the Defendant dated his cousin, Danielle O'Neal and that the Defendant and Ms. O'Neal had two children together. A few weeks before the altercation, the Defendant and the victim argued. The victim testified that on the night of May 10, 2008, he drank two or three 12-ounce beers before arriving at the Soul Train Bar and Grill in Lewisburg, Tennessee with his girlfriend, Tikeya Johnson. Once he arrived at the bar, he drank two mixed drinks of "gin and juice." He consumed these drinks within 10 or 15 minutes. At approximately midnight, the victim went outside, where he saw the Defendant. The victim walked up to the Defendant and said, "[We need to] stay away from each other because I don't like you and you don't like me." In response, the Defendant "pushed" or "mugged"[1] the victim's head, and the two started fighting. When the victim, who was winning the fight, stepped back, the Defendant retrieved a "semi-automatic pistol-type weapon" from his waistband area and "loaded a bullet into the chamber." The Defendant then looked at the victim and shot him one time in the neck before running away. The victim walked toward Ms. Johnson but "slightly stumbled" before Ms. Johnson and Ashton Davis were able to help him to his car. Ms. Johnson drove him to the hospital.

The victim testified that when he arrived at the hospital, he was in "excruciating pain" until he was given medication. He said that the pain medication did not relieve all of his pain and that he stayed in the hospital for 13 days. The victim testified that his pain did not fully go away until a month or two later. The victim stated that the bullet collapsed his lung and that doctors had to "repump" his lung. He stated that he was unable to eat solid foods because of the pain resulting from the collapsed lung.

Ms. Johnson testified that she drank a shot of Calvert before she left for the bar and that she drank a "hunch punch" when she arrived at the bar. She stated that she was outside when the victim was talking to the Defendant. She heard the victim when he said, "I don't like you, and you don't like me. Don't disrespect me, and I won't disrespect you." Ms. Johnson did not see the victim and the Defendant fighting because she had walked to her car. She thought "they were just going to squash everything" until she heard two gunshots. When she ran back to the victim, she saw the victim taking his shirt off to examine himself. She stated that she also saw the Defendant and a man named Shelby Harris running along the right side of the building away from the victim. She testified that she went inside the bar and told Ms. O'Neal that "her baby's daddy had shot [the victim]." After talking to Ms. O'Neal, Ms. Johnson drove the victim to the Marshall County Medical Center.

---

[1] The victim stated that the Defendant's act of "mugging" the victim's head was a sign of disrespect.

Ms. Davis testified that she was also outside of the Soul Train Bar and Grill when the victim and the Defendant were fighting. She testified that she saw the Defendant smack the victim in the face. She said that after the Defendant smacked the victim, the victim hit the Defendant. Ms. Davis testified that the Defendant was losing the fight and that the victim was still hitting the Defendant when the Defendant pulled out his gun and shot the victim. She said that she did not see what happened next because "she took off running on the side of the building when [she] heard the gunshot." When she returned, she saw that the victim was bleeding "somewhere in the chest area."

Dr. Jose Diaz, a general surgeon and associate professor in the trauma, critical care, and surgery division at Vanderbilt University, treated the victim at Vanderbilt Hospital. Dr. Diaz testified that the victim was shot "just above his sternal notch" and that the victim was also injured in the "right posterior axillary area," which is "just underneath the armpit area." This second injury was inflicted when the bullet exited the body. Dr. Diaz stated that the bullet went through the "right thoracic cavity in the lung" and that as a result, the victim "had bleeding into the thoracic cavity or chest wall cavity." He stated that the injury to the lung also resulted in "pneumothorax, which is air trapped within the thoracic cavity" and that the air in the thoracic cavity escaped into "the chest wall area." He testified that he placed a chest tube into the thoracic cavity in order to "drain the blood and the air" and "reexpand the lung." He stated that the victim also fractured two of his ribs and that the victim had to take Fentanyl, a "very powerful narcotic medication" for his pain. Dr. Diaz testified that the victim stayed at Vanderbilt Hospital for approximately five days. He said that victim's injuries were life-threatening and that the victim was in extreme physical pain until he was given medication.

Amanda Newcomb of the Lewisburg Police Department testified that she was dispatched to the Soul Train Bar and Grill sometime between 1:00 and 2:00 a.m. on the morning of May 11, 2008. When she arrived, she attempted to talk to the 10 or 12 people that were standing outside; however, everybody told her that they did not see anything. In her investigation with Sergeant Anthony McLean, who arrived approximately one minute after she arrived, they noticed blood on a car that was parked near the front door. They found blood on the sidewalk near the front door and a shell casing that was a "[c]ouple of inches" from the blood. They also found a trail of blood along the right side of the building. Sergeant McLean testified that the gray vehicle with the blood on the hood was approximately two feet from the front door of the bar and that the shell casing was found "within a foot" of the "passenger side of the front tire."

Officer Jason Lee of the Cornersville Police Department testified that on May 14, 2008, he saw an object "on top of the old factory directly behind the Soul Train" Bar and Grill. Because he believed that this object might be the Defendant's gun, he contacted

Detective Sergeant Jimmy Oliver, who was the lead detective handling the Defendant's case. When Detective Sergeant Oliver arrived, he went onto the roof and found what was believed to be the Defendant's gun. Officer Lee then identified photographs of the gun and the location in which it was found. Officer Lee testified that a "[s]wirl mark" on top of the building near the gun indicated that the gun had been thrown onto the roof and then slid across the top of the building. He stated that there was a bullet in the chamber of the semi-automatic weapon and that there was also a magazine inside of the weapon.

Detective Sergeant Oliver of the Lewisburg City Police Department testified that he was notified about the altercation at the Soul Train Bar and Grill and that he arrived after Officer Newcomb and Sergeant McLean arrived. He identified several photographs that he took in the Soul Train Bar and Grill parking lot and a 9 millimeter shell casing that he recovered from the crime scene. He stated that he did not find the bullet at the scene but that he noticed a dent in a nearby car that was likely caused by the bullet. He said that he found blood on the hood of the dented vehicle. He also found blood in several places on the ground. He found blood toward the front of the Soul Train building and to the left of the dented vehicle, in the alleyway to the right of the building, and in various spots on the sidewalk in front of the building. He stated that with the help of Officer Lee, he located a 9 millimeter semi-automatic weapon on top of the building behind the Soul Train Bar and Grill. Detective Sergeant Oliver then identified the 9 millimeter weapon, the 9 millimeter round that was found in the weapon, and the magazine that was found in the weapon.

Detective Sergeant Oliver testified that the Defendant was found in Memphis on May 27, 2008. On cross-examination, Detective Sergeant Oliver testified that the Defendant had "an older scar" above his eye when he was found in Memphis and that the blood found along the side of the Soul Train Bar and Grill likely belonged to the Defendant because the victim did not go in that area after he was shot.

Suzanne Lafferty of the Tennessee Bureau of Investigation (TBI) crime laboratory in Nashville testified that she did not find any fingerprints on the cartridge from the magazine found in the weapon or on the cartridge found in the chamber of the weapon.

Alex Brodhag of the TBI forensic services division testified that through his examination of the weapon involved in this case, he was able to determine that the cartridge that was found in the weapon had been chambered and extracted from the pistol but not fired from the pistol. He testified that he also examined the shell casing that was recovered from the crime scene and that he believed, in his expert opinion, that the shell casing was fired from the 9 millimeter weapon that was found on top of the building next to the Soul Train Bar and Grill.

Jenise Nelson of the Marshall County Circuit Court Clerk's Office testified that the Defendant was convicted of possession of cocaine with intent to sell and possession of cocaine with intent to deliver on March 11, 2002. The judgments reflect that the trial court merged these two convictions and sentenced the Defendant to 12 years.

Dr. Jeffery Jordan, an optometrist of the Advanced Eye Care Clinic, testified for the defense. Dr. Jordan stated that he examined the Defendant in August 2008 because the Defendant complained of "flashes of light in his vision and black spots in his vision." He stated that black spots in patients' eyes are generally caused by what he calls "floaters" and that flashing lights in patients' eyes are generally caused by jelly in the eye that moves back and forth, pulls the retina, and fires the photo receptors, causing the patient to receive an "electrical stimulation of a flashing light." He stated that the Defendant's condition would be normal for someone in their 60s or 70s because the "jelly" in the eye tends to "shrink up with time" and "pull[] off of the retina" as it shrinks, which causes the flashing lights. Dr. Jordan testified that if a young patient is experiencing these kinds of symptoms, then the condition is generally trauma-related. Dr. Jordan stated that the Defendant told him that he had been struck in the left eye. Dr. Jordan testified that "blunt trauma would most likely have caused the floaters and the syneresis, which is the jelly that coagulates in such a young patient." On cross-examination, Dr. Jordan admitted that the Defendant's injury did not impact his vision but stated that the Defendant's condition would never improve.

## ANALYSIS

### I. Sufficiency

The Defendant challenges the sufficiency of the evidence for his convictions of attempted second degree murder and possession and employment of a firearm during the commission of a felony. The State responds that the evidence was sufficient to sustain his convictions.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not re-weigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption

of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

*Second Degree Murder*

The Defendant contends that the evidence was insufficient to sustain his conviction of attempt to commit second degree murder when the Defendant shot the victim once because the victim was "viciously beating" him while he was unable to fight back. The Defendant further contends that the evidence, at best, only supports a conviction of aggravated assault. The State responds that the evidence was sufficient to sustain this conviction when the Defendant inflicted a life-threatening wound by shooting the unarmed victim in the neck and then fled from the crime scene. The State further responds that aggravated assault is not a lesser-included offense of attempted second degree murder and that the jury rejected all statutory lesser-included offenses.

Second degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). A person attempts to commit second degree murder when he "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

Viewing the evidence in the light most favorable to the State, the trial evidence indicates that the Defendant initiated a physical altercation with the victim. The evidence also indicated that the victim, who was unarmed, was winning the fight and inflicting injuries upon the Defendant. However, the victim had stepped back and let the Defendant go when the Defendant looked at the victim and then shot him in the neck. The Defendant ran away from the injured victim and disposed of the weapon by throwing it on top of a nearby building. According to Dr. Diaz, the victim's injuries were life-threatening. As to the Defendant's contention that he should have been convicted of aggravated assault, the jury heard his claim of self-defense and argument that he should have been convicted of attempted voluntary manslaughter and rejected it. Accordingly, we conclude that the evidence was sufficient to support the Defendant's conviction of attempted second-degree murder when the Defendant knowingly shot the victim in the neck.

*Possession and Employment of a Firearm During the Commission of a Felony*

The Defendant contends that the evidence was insufficient to sustain his convictions for the possession and employment of a firearm while attempting to commit a dangerous felony. Specifically, the Defendant contends that he did not possess or employ a firearm while attempting to commit second degree murder. The Defendant contends that because he should have been convicted of aggravated assault, which is not a dangerous felony pursuant to Tennessee Code Annotated section 39-17-1324(i)(1), his convictions of possession and employment of a firearm during the commission of a felony should not be upheld. The State responds that because the evidence was sufficient to sustain his conviction of attempted second degree murder, the evidence was also sufficient to sustain the convictions of possession and employment of a firearm during the commission of a felony.

Tennessee Code Annotated section 39-17-1324 states, in pertinent part,

> (a) It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony.
>
> (b) It is an offense to employ a firearm during the:
>
> > (1) Commission of a dangerous felony; [or]
> > (2) Attempt to commit a dangerous felony[.]

Tenn. Code Ann. § 39-17-1324(a) (Supp. 2007) (effective January 1, 2008). Attempting to commit second degree murder qualifies as a dangerous felony for purposes of this section. Tenn. Code Ann. § 39-17-1324(i)(1)(A).

The evidence introduced at trial, viewed in the light most favorable to the State, reflected that the Defendant, using his weapon, shot the unarmed victim in the neck. The victim suffered a life-threatening injury, and the Defendant was charged and convicted of attempted second-degree murder, one of the statutorily-prescribed felonies for purposes of this statute. Following our review, we concluded that the evidence was sufficient to sustain his conviction of attempted second-degree murder. Accordingly, we also conclude that the evidence was sufficient to sustain the Defendant's convictions of possession and employment of a firearm while attempting to commit second-degree murder.

## II. Sentencing

The Defendant does not contest the imposition of consecutive sentencing in his case; however, the Defendant contends that his sentence of fifteen years for his attempted second-degree murder conviction was excessive and contrary to law when the weight given to the statutory enhancement factors did not comply with the purposes and principles of the sentencing act. The Defendant further contends that the sentence imposed in his case was not warranted given the totality of the circumstances surrounding the offense and that the trial court should have considered the fact that, according to State v. Ashby, 823 S.W.2d 166 (Tenn. 1991), Tennessee has scarce prison resources. The State responds that the trial court's sentencing decision was supported by the record and was in accordance with the purposes and principles of the sentencing act.

Jim Grimes of the Tennessee Probation and Parole Department testified at the sentencing hearing that the victim's compensation fund paid the victim's $20,000 hospital bill. Mr. Grimes stated that the Defendant was on parole at the time the Defendant committed the instant offenses and that a parole revocation warrant was currently pending. Mr. Grimes noted that the Defendant had several prior convictions – a conviction of sale of cocaine, a Class B felony; a conviction of facilitation of aggravated robbery, a Class C felony; and a juvenile conviction of what would be an aggravated assault conviction if he were an adult. Mr. Grimes noted that, in addition to the current pending parole revocation warrant, the Defendant had received parole revocation warrants on July 8, 1998, and November 17, 2006. Mr. Grimes stated that the Defendant told him that he had used marijuana "off and on since he was 16" and noted that the Defendant had been fired from his job at International Comfort Products. On cross-examination, Mr. Grimes admitted that the Defendant was attending barber college in Murfreesboro, Tennessee and that the Defendant had worked several jobs.

At the sentencing hearing, the trial court noted that, relative to the Defendant's conviction of employment of a firearm while attempting to commit a dangerous felony, Tennessee Code section 39-17-1324 provides, in pertinent part, that:

> (e)(1) A sentence imposed for a violation of subsection (a) or (b) shall be served consecutive to any other sentence the person is serving at the time of the offense or is sentenced to serve for conviction of the underlying dangerous felony.
>
> (h)(2) A violation of subsection (b) is a Class C felony, punishable by a mandatory minimum ten-year sentence to the

department of correction, if the defendant, at the time of the
offense, had a prior felony conviction.

Tenn. Code Ann. § 39-17-1324(e)(1), -1324(h)(2).  The trial court noted that the proof
showed that the Defendant had a prior conviction.  Thus, the trial court imposed the
mandatory ten-year sentence for the conviction of employment of a firearm while attempting
to commit a dangerous felony.  The trial court also ordered the Defendant to serve the ten-
year sentence consecutively to his sentence for the attempted second-degree murder
conviction and the conviction for which he was on parole when he committed the instant
offense.

In determining the Defendant's sentence for the attempted second-degree murder
conviction, the trial court applied the following enhancement factors:

> (1) The defendant has a previous history of criminal convictions
> or criminal behavior, in addition to those necessary to establish
> the appropriate range;
>
> (6) The personal injuries inflicted upon . . . the victim [were]
> particularly great;
>
> (8) The defendant, before trial or sentencing, failed to comply
> with the conditions of a sentence involving release into the
> community;
>
> (13) At the time the felony was committed, one (1) of the
> following classifications was applicable to the defendant:
> > (B) Released on parole
>
> (16) The defendant was adjudicated to have committed a
> delinquent act or acts as a juvenile that would constitute a felony
> if committed by an adult[.]

Tenn. Code Ann. § 40-35-114.  The trial court noted the Defendant's proposed mitigating
factors and then sentenced the Defendant to 15 years for the attempted second degree murder
conviction.  The trial court further found that, in addition to the statutorily-prescribed
consecutive sentencing determination, consecutive sentencing was warranted because the
Defendant also qualified as a dangerous offender. Tenn. Code Ann. § 40-35-115(b)(4).  The
trial court noted the imposition of consecutive sentencing reasonably related to the severity

-9-

of the offense and was necessary to protect the public from further serious criminal conduct. See State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d) (2005). The appealing party has the burden of showing that the imposed sentence is improper. Id. If review of the record reflects that the trial court properly considered all relevant factors, gave due consideration and proper weight to each factor, and its findings of fact are adequately supported by the record, this court must affirm the sentence. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Should the record fail to demonstrate the required considerations by the trial court, then appellate review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169. In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. Tenn. Code Ann. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see Tenn. Code Ann. § 40-35-210(e).

The Defendant committed these offenses on May 11, 2008; thus, he was sentenced under the revised sentencing act as enacted by the Tennessee General Assembly in 2005. The act provides that:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> > (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class

-10-

> to reflect the relative seriousness of each criminal
> offense in the felony classifications; and
>
> (2) The sentence length within the range should
> be adjusted, as appropriate, by the presence or
> absence of mitigating and enhancement factors set
> out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2) (2006).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210(d)-(f); Carter, 254 S.W.3d at 342-43. "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." Carter, 254 S.W.3d at 346. Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. See id.

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the potential for rehabilitation or treatment, and (8) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

A defendant may be sentenced as a multiple offender if he has received:

> (1) A minimum of two (2) but not more than four (4) prior
> felony convictions within the conviction class, a higher class, or
> within the next two (2) lower felony classes, where applicable;
> or
>
> (2) One (1) Class A prior felony conviction if the defendant's
> conviction offense is a Class A or B felony.

-11-

Tenn. Code Ann. § 40-35-106(a).

Here, the Defendant was convicted of a Class B felony and had one prior Class B felony conviction and one prior Class C felony conviction. As the Defendant was correctly sentenced as a multiple offender and was convicted of a Class B felony, we reject the Defendant's contention that the trial court should have considered the scarcity of prison resources when sentencing the Defendant. <u>See</u> Tenn. Code Ann. § 40-35-102(6)(A). As to the Defendant's contention that the sentence imposed for his attempted second-degree murder conviction was excessive, we disagree. The Defendant was convicted of a Class B felony and qualified as a Range II offender. Accordingly, the trial court was required to sentence the Defendant within the range of 12 to 20 years. <u>See</u> Tenn. Code Ann. § 40-35-112(b)(2). After considering the appropriate enhancement and mitigating factors, the trial court sentenced the Defendant to 15 years. Following our review, we conclude that the trial court's imposition of the enhancement factors and ultimate sentencing decision was supported by the record.

<u>CONCLUSION</u>

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE